# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2011

## STATE OF TENNESSEE v. JOHN DAVID LUTHER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2459     Monte D. Watkins, Judge**

---

**No. M2010-01237-CCA-R3-CD - Filed December 22, 2011**

---

A Davidson County jury convicted the defendant of attempted voluntary manslaughter, a Class D felony; aggravated assault, a Class C felony; and reckless aggravated assault, a Class D felony. The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction and sentenced the defendant as a Range II, multiple offender to an effective sentence of seventeen years in the Tennessee Department of Correction. On appeal, the defendant argues that (1) the trial court improperly instructed the jury by failing to instruct the jury about voluntary intoxication and by misstating the definition of attempt; (2) the trial court erred by imposing consecutive sentences; (3) the assistant district attorney committed misconduct by repeatedly using a racial slur to inflame the jury; and (4) the trial court erred by admitting irrelevant testimony. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Patrick G. Frogge (on appeal) and Paul J. Walwyn (at trial), Nashville, Tennessee, for the appellant, John David Luther.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Hugh T. Ammerman, III and Leticia F. Alexander, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

On August 4, 2008, a Davidson County Grand Jury indicted the defendant for attempted first degree murder, a Class A felony; aggravated assault, a Class C felony; and reckless aggravated assault, a Class D felony. The case proceeded to trial by jury in November 2009.

Patrick Lamar, the victim of the reckless aggravated assault, testified that on May 25, 2008, he met Daniel Harding, Corina Pinya, Niki Curtis, and Prince Speights at Greenland's Pub shortly after midnight. He said that he and his friends were on the deck of the pub when the defendant came onto the deck from inside the pub. Lamar testified that the defendant, who appeared intoxicated, "said he did not like white people that dressed like n***ers." Lamar said that no one in his group "appreciated the comment" and that one person in the group was African-American. According to Lamar, Harding asked the defendant to go back inside the pub, and the defendant did. Fifteen to twenty minutes later, the defendant returned and apologized. Again, Harding asked the defendant to go back inside, and the defendant did. Approximately ten minutes later, the defendant returned to the deck. Lamar said that Harding and the defendant "got into what appeared to be a fistfight." When he heard the commotion, he tried to break up the fight but was knocked back. He heard Harding yelling that he had been cut. Lamar said that he saw Harding "bleeding profusely from the neck." He said that people came from inside the bar, took the victim into the bar, and tried to wrestle the knife away from the defendant. Lamar testified that he received a cut on his forearm that required three stitches while trying to break up the fight. He said that he did not see the knife until after the defendant had cut him and Harding. Lamar testified that he was never aggressive with the defendant and did not start the fight. He said that Harding was not aggressive with the defendant, and he did not see Harding "lay hands on" the defendant.

Prince Speights testified that on May 24, 2008, he watched a televised mixed martial arts fight at the gym where he and Harding trained, along with Harding and Niki Curtis. After the televised fight, the three went to Greenland's Pub where they were joined by Curtis' friend and Patrick Lamar. They began drinking inside, but Speights wanted to go outside because he was not feeling well. He laid down on a bench on the pub's deck while the rest of the group sat and talked on the deck. He recalled seeing the defendant inside the bar and then later on the deck talking to Harding. Speights heard the defendant tell Harding that if he had been "raised right [he] wouldn't be hanging around these n***ers" and that he did not like "how white youth try to dress like n***ers." According to Speights, Harding told the defendant that he could not disrespect his friend and asked him to go back inside the pub. The defendant went inside but came back outside later and said something. Harding asked the defendant to go back inside again. The third time that the defendant came outside, Speights said that he acted as if he were "going to grab" Harding, and Harding "went to,

basically, defend himself." The group started to break up the fight, Harding turned to Speights and said "that he had been stabbed in the neck." Speights said that he saw Harding holding his neck and saw blood coming through his fingers. At that point, he said that they took Harding inside and that he stopped paying attention to the defendant. Speights testified that he did not have any direct interaction with the defendant and did not observe anyone acting aggressively toward the defendant.

Nashville Metropolitan Police Officer Brad Rumbley testified that on May 25, 2008, he responded to a stabbing call at Greenland's Pub. When he arrived, he observed a man lying just inside the front door being attended to by several people. The people informed him that the person responsible for the stabbing was on the pub's deck. Officer Rumbley said that he went to the deck and saw the defendant lying on his back with two or three people standing nearby. One of the bystanders had the knife used, and Officer Rumbley asked the person to put the knife down. Officer Rumbley said the defendant "was mumbling his words [and] said that he got beat up."

Daniel Harding testified that he had been watching a televised mixed martial arts fight at his gym before going to Greenland's Pub with Niki Curtis and Prince Speights. He said that they arrived at the pub near midnight. Harding said that approximately thirty seconds after walking into the pub, the defendant "called [him] over to him and . . . [said], 'Do you know what your problem is?'" The defendant told Harding that he did not have anyone in his life "'like [the defendant] to give [him] direction, that's why [he] hang[s] out with these n***ers.'" The victim testified that he responded, "'Well, if you feel like that it's best that you stay in the bar and I'll take my group and we'll go outside.'" The victim and his friends went outside, and the defendant came outside later to offer an apology. The victim told him, "'That's okay . . . just go back inside.'" He testified that the defendant went back inside. When the defendant later came back outside, he had a drink and had his right arm behind his back. The defendant told Harding that he had gotten the drink for him. Harding testified that as the defendant was talking, he walked around the defendant to see what he was holding behind his back. Harding said that from the light above the deck he saw the reflection of a knife, which was already open. He said that he "grabbed [the defendant] to the ground[,] punched him a bunch[,] and [the defendant] was stabbing [him]." Harding said that he realized that he had been cut when he "noticed that [the defendant] was out." He said that he had seen his own blood "hitting [the defendant] in the face" but thought that it was the defendant's blood. Harding recalled telling Speights that he had been cut and that a nurse began treating him. He further recalled going to the Southern Hills Medical Center and hearing that he needed to be sent to Vanderbilt University Medical Center. Harding said that the next thing he remembered was waking up at Vanderbilt. He testified that the defendant cut his throat, arm, and the top of his head. He suffered a stroke as a result of an artery being cut, leading to temporary partial paralysis and requiring physical therapy. The victim said

-3-

that he never tried to prevent the defendant from leaving the pub and that there were two exits the defendant could have used if he had wanted to leave. He estimated that the fight lasted thirty seconds.

Scott Downs testified that he was at Greenland's Pub on May 25, 2008. He was inside the pub when he heard someone say that there was a fight on the deck, and then he saw blood splatter onto the glass doors leading out to the deck. Downs said that, as he went outside, Harding was coming in the door. Downs testified that he saw a man lying on the ground holding a knife, which was pointed up, and another man standing over him. Mr. Downs said that "it look[ed] like [the man on the ground] was fixing to just gut [the man standing over him]," so Downs took the man's knife by force, receiving a small cut on his hand in the process. He testified that the man was fully conscious and did not give up the knife willingly. Downs testified that he had met Harding the week prior to the incident but had not seen him since May 2008. He said that he did not know the man with the knife and would not recognize him.

Nashville Metropolitan Police Detective Fredrick Sulfridge testified that he spoke to the defendant while the defendant was at the hospital. He explained to the defendant that he was investigating the stabbing. Detective Sulfridge testified that the defendant appeared "to be pretty drunk" and began cursing him repeatedly. He remembered the defendant saying about the victim, "'F**k that n***er.'" When Detective Sulfridge pointed out to the defendant that the victim was white, the defendant said, "'Well, f**k that n***er lover.'" Detective Sulfridge testified that he observed an abrasion under the defendant's left eye. He said that the defendant was not cooperative, so he left the hospital without taking a statement. On cross-examination, Detective Sulfridge testified that his investigation led him to believe that the defendant was the primary aggressor.

Dr. Ann O'Duffy testified that she was a neurologist at the Vanderbilt University Medical Center and that she specialized in treating strokes. She said that when Harding arrived at Vanderbilt, he had two stab wounds to his neck, and his carotid artery and jugular vein were severed in those areas. He also had a wound to his left shoulder and a laceration on the bridge of his nose. The surgeons had to tie off the injured vein and artery because the damage was beyond repair. Dr. O'Duffy testified that Harding "would have died, almost without a doubt" if not for the emergency surgery. She said that he lost a large amount of blood and had multiple transfusions. Dr. O'Duffy testified that Harding suffered a stroke four days after admission into the hospital. The stroke impaired his language faculties and temporarily paralyzed him. She said that he worked hard in rehabilitation to recover.

The defendant testified that he went to Greenland's Pub on May 25, 2008, near midnight. He drank two rum and Cokes while at the pub. The defendant recalled seeing

Harding and his friends come into the pub. He said that they were "toasting to cage fighting." The defendant said that he asked Harding whether he was a cage fighter, and he said that he was. The defendant testified that an entertainer was at the pub, and he made a comment about the entertainer, saying "'perfectly good white boy dressed like a n***er.'" When Harding and his friends went out to the deck, he followed them and talked to Harding about where he might be able to see a live cage fighting match in Nashville. The defendant said that just before he went back inside the bar, Harding told him not to come back out to the deck. He testified that he "really didn't think anything of it." He said that he went inside and finished his drink. He planned to go to his car, which was parked by the deck, so he exited the pub by the door leading to the deck. He said that normally he would have immediately gone straight to his car, but that night he hesitated. The defendant testified that Harding saw him, "and [Harding] jumped up and swung around[] one of those island bars and started hitting [him] in the back of the head." The defendant said that while he was hitting him, Harding said that he had told him not to come back out on the deck. The defendant testified that when he "got a little break," he reached into his pocket and brought out his knife. He said that Harding hit him twice in the face, once in each eye. The defendant said that he "had pulled [his] knife out and . . . didn't know where [he] was aiming [at] for sure, but [he] just wanted [Harding] to stop beating on [him]." The defendant testified that someone hit him in the back of the head while he and Harding "were standing there [with] the knife in [Harding's] neck." He said that someone hit him in the back of his head until they knocked him out. The next thing he remembered was waking up in the hospital. The defendant did not recall talking to Detective Sulfridge but said that it was possible that he might have said what Detective Sulfridge testified to because of the drinks he had and the medication the hospital had given him.

On cross-examination, the defendant said that he thought he only struck Harding once with the knife. He also said that he would not have lost consciousness due to alcohol, agreeing that he could "take two rum and Cokes."

Following the close of proof and deliberations, the jury convicted the defendant of the lesser-included offense of attempted voluntary manslaughter, aggravated assault, and reckless aggravated assault. The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction and sentenced the defendant as a Range II, multiple offender to ten years for the aggravated assault conviction consecutive to seven years for the reckless aggravated assault conviction. The trial court denied the defendant's motion for a new trial, and the defendant filed a timely appeal.

## ANALYSIS

### I. Jury Instructions

-5-

The defendant argues that the trial court erred by denying his request for a jury instruction on voluntary intoxication and its effect on *mens rea*. Also related to the jury instructions, the defendant contends that the trial court misstated the definition of "attempt."

## A. Standard of Review

In criminal cases, a trial court has an obligation to instruct the jury fully on the general principles of law that are relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). To satisfy the defendant's constitutional right to a trial by jury, a "clear and distinct exposition of the law" is necessary. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Questions concerning the propriety of jury instructions are mixed questions of law and fact, and thus our standard of review is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In general, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). On appeal, when determining whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994), *abrogated by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003)). In evaluating claims of error in jury instructions, courts must remember that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *State v. Vann*, 976 S.W.2d 93, 101 (quoting *Boyde v. California*, 494 U.S. 370, 380-381 (1990)). A jury instruction is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

## B. Voluntary Intoxication Instruction

The record reflects that the defendant asked the trial court to include a jury instruction on intoxication and its effect on the defendant's *mens rea*. The trial court deferred ruling on the matter until after the close of proof. At that time, the trial court stated, "Well, you know, . . . you have to plead the defense of intoxication. He said he wasn't intoxicated. So I can't give that charge. I can give the self-defense charge but not the intoxication charge." On

appeal, the defendant argues that the evidence sufficiently raised the issue and that the trial court should have instructed the jury on how to consider the evidence of intoxication.

In Tennessee, intoxication is not a defense to prosecution for an offense but "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). "[W]hen a defendant is charged with an offense that requires a culpable mental state, such as first degree murder, 'a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required.'" *State v. Henretta*, 325 S.W.3d 112, 130 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 815 n.16 (Tenn. 2010)), *cert. denied*, __ U.S. __, 131 S. Ct. 1816 (2011).

In this case, some of the witnesses testified that the defendant appeared intoxicated. The defendant admitted that he drank two rum and Cokes, but on cross-examination, he agreed that the amount he drank was not enough to make him drunk. Defense counsel mentioned intoxication in his closing in the context of describing the scene of the fight - a bar. The defense never presented any evidence nor made any arguments that the defendant lacked the culpable mental state for the charged offenses because of intoxication. Therefore, we conclude that the trial court did not err by denying the defendant's request for a jury instruction on intoxication. *See State v. Dana Keith Woods*, No. W2006-00657-CCA-R3-CD, 2007 WL 4530818, at *9 (Tenn. Crim. App. Dec. 26, 2007), *perm. to appeal denied* (Tenn. May 27, 2008); *see also State v. Jeffrey Booth*, No. W2009-00452-CCA-R3-CD, 2010 WL 4621887, at *11-12 (Tenn. Crim. App. Nov. 15, 2010).

### C. Definition of "Attempt"

The defendant argues that the trial court misstated the law regarding criminal attempt in its jury instructions. The record reflects that the trial court, when listing the elements of criminal attempt, stated that the State had to prove that the defendant intended to commit the offense of first degree murder and "that the defendant did some act intending to cause an essential element of voluntary manslaughter to occur; and at the time believed the act would cause the element to occur without further action on the defendant's part." The defendant argues that the variance between the court's instructions and Tennessee Code Annotated section 39-12-101(a)(2), which states "[a]cts with intent to cause a result that is an element of the offense," rendered the instructions reversibly erroneous. In his brief, the defendant states, "If the jury followed the court's instructions literally, it may have found [the defendant] guilty by finding that he intended to commit voluntary manslaughter and that he did some act intending to cause the mens rea of voluntary manslaughter to occur."

The specific instruction under review comes from the Tennessee Pattern Jury Instructions for criminal trials. T.P.I. 4.01. Pattern jury instructions are not subject to deference upon review because neither the Tennessee Supreme Court nor the General Assembly has approved them. *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008). This court must review jury instructions as a whole, without examining specific phrases in isolation. *Id.* at 31. Interpreting the jury instructions with common sense and avoiding technical hairsplitting, we do not see how the complained-of phrase would have misled the jury as to the law of criminal attempt. Essentially, the charge required the jury to find that the defendant intended to commit voluntary manslaughter and that the defendant did some act that would cause voluntary manslaughter without further action on the part of the defendant. Therefore, we conclude that the defendant is without relief as to this issue.

## II. Consecutive Sentencing

The defendant contends that the trial court erred in imposing consecutive sentences. Specifically, the defendant argues that the trial court did not make specific findings of fact, as required by *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), when the trial court determined that the defendant was a dangerous offender. The defendant also briefly argues, without any support, that his criminal record was not extensive.

At the sentencing hearing, the State urged the court to impose consecutive sentences based on the defendant's criminal record and on his being a dangerous offender. The state argued that the defendant was a dangerous offender because of the severity of the offense and because of his criminal history. The trial court made the following findings when imposing consecutive sentences:

> The Court, then, must look to T[ennessee] C[ode] A[nnotated] 40-35-115 to determine whether [the sentences] should be concurrent or consecutive. And the Court believes that these apply: That the defendant is an offender whose record of criminal activity is extensive; and, secondly, that the defendant is a dangerous offender whose behaviour [sic] indicates little or no regard for human life; and, there was no hesitation about committing a crime in which the risk to human life is high. As such, the Court believes that the sentences should be consecutive to one another.

> But additionally the Court must find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and, that the consecutive sentences must reasonably relate to the severity of the offenses committed. The Court clearly believes that this was a very serious offense, particularly fashioned upon Mr. Harding. So the Court

-8-

believes that the appropriate sentence is seventeen years as a range two [multiple] offender.

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). "This presumption is 'conditioned upon an affirmative showing in the record that the trial [judge] considered the sentencing principles and all relevant facts and circumstances.'" *State v. Pettus*, 986 S.W.2d 540, 543 (Tenn. 1999) (quoting *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997)). If the trial court fails to comply with the statutory directives, "there is no presumption of correctness and our review is de novo." *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:

(1) [t]he evidence, if any, received at the trial and the sentencing hearing;

(2) [t]he presentence report;

(3) [t]he principles of sentencing and arguments as to sentencing alternatives;

(4) [t]he nature and characteristics of the criminal conduct involved;

(5) [e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114;

(6) [a]ny statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000).

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria applies:

(1) [t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *Wilkerson*, 905 S.W.2d at 937-38.

The trial court first found that the defendant had a record of extensive criminal activity. The defendant's presentence report lists his most recent offense, prior to the instant offenses, as a DUI conviction in 1986. Prior to the 1986 DUI, he had several convictions for offenses during the 1970s. We conclude that this evidence supports the trial court's finding that the defendant had a record of extensive criminal activity.

As for the court's finding that the defendant was a dangerous offender, the trial court did not support its finding that an extended sentence was necessary to protect the public. Recently, in *State v. Matthew Joseph Carter*, No. E2009-00217-CCA-R3-CD, 2010 WL 4324386, at *9 (Tenn. Crim. App. Nov. 2, 2010), a panel of this court reversed the trial court's imposition of consecutive sentences on the dangerous offender factor because the trial court "did not mention any 'particular facts' upon which it based its finding that an extended sentence was necessary to protect the public." *Id.* As in *Carter*, the trial court's findings indicate that it relied solely on the severity of the offense in finding that the defendant was a dangerous offender; therefore, we conclude that the trial court's findings do not conform to *Wilkerson* and that the trial court erred by finding that the defendant was a dangerous offender. However, the trial court need only find one factor under Tennessee Code Annotated section 40-35-115(b) to support consecutive sentencing. Because the trial court found that the defendant had an extensive criminal record, we affirm the trial court's imposition of consecutive sentences.

### III. & IV. Waiver

The defendant argues that the State committed prosecutorial misconduct by its repetition of the word "n***er." The defendant also argues that the trial court erred by admitting the testimony of Dr. Ann O'Duffy because her testimony was irrelevant. The State responds that the defendant has waived both issues for failure to make a contemporaneous objection, and we agree. The record reflects that the defendant never objected to the State's use of the word "n***er" and that both defense counsel and the defendant used the word. Indeed, nearly every use of the term during the trial was in the context of quoting the defendant. As for Dr. O'Duffy's testimony, the defendant stipulated to her expert qualifications and never objected at any point to her testimony. We, therefore, agree with the State that the defendant has waived this issue for appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE